# STATE v. J. B. DYER ET ALS.

OCTOBER TERM, 1894.

*Conspiracy. Punishable at common law. Prosecution by information. Evidence. Uncertainty in pleading. Joint trial. Ground of exception must be stated in trial court.*

1. A combination of two or more persons to constrain an employer to discharge a particular workman by threatening to prevent his obtaining other workmen, or to constrain a workman to join a certain organization by threatening to prevent him from obtaining work unless he does so is a criminal conspiracy at common law.

2. Such offence is a misdemeanor, and the prosecution may be, therefore, by information.

3. R. L., s. 4365, providing that where an offence is punishable by imprisonment it shall be in the house of correction unless specified to be in the state prison, applies to penalties inflicted by the common law.

4. *Held*, that the counts in this information were not bad for uncertainty.

5. *Held*, that a conversation between two of the respondents and a third person which took place on the Sunday next after the week during which the acts complained of were committed, was properly received, first, because it connected these respondents with the crime, and second, because it was so near the acts in point of time as to be virtually concomitant with them.

6. Upon the joint trial of several respondents, the admissions of one may be received under proper instructions to the jury that they are evidence against him alone.

7. If a respondent relies upon a misnomer to sustain a motion for a verdict, he should point out that ground in the trial court or it will not be considered in the supreme court.

8. The evidence tended to show a conspiracy to compel one McClure to join the Granite Cutters' National Union or quit work, and that in consequence McClure had stopped work. The respondents were all members of this association and in what they did acted as such. _Held_, that the evidence warranted the conviction of Dyer, who was the secretary of the association, although no act of his was shown in connection with the matter until after McClure had actually stopped work.

Information in two counts. Plea, not guilty. Trial by jury at the September term, Washington county, MUNSON, J.; presiding. Verdict, guilty. Judgment on verdict. The respondents except.

The material part of the information was as follows: First count:

"That Josiah B. Dyer and Thomas Quinlan of Barre, in the county of Washington, and Frank Morrill, Patrick Morrison, Peter Hernon, E. D. Sherburne, H. P. Sylvester, Thomas Hocking and Alex. Cruickshank of Montpelier, in the county of Washington, with divers evil disposed persons, to the state's attorney unknown, on the 22d day of November, in the year of our Lord one thousand eight hundred and eighty-nine, at Montpelier, in the county of Washington, did unlawfully combine, conspire, confederate and agree together to prevent, hinder and deter, by violence, threats and intimidation, one Jacob McClure, then and there being a stone cutter by trade and occupation, in the employment of the Wetmore & Morse Granite Company of Montpelier, aforesaid, a corporation then and there being and existing by law, from obtaining work or employment, or continuing in his said work and employment, at his said trade or occupation, in the said shops of the said Wetmore & Morse Granite Company of Montpelier aforesaid, or in any other shops or works for the cutting or manufacture of granite work, with the malicious and unlawful intent, of them the said Josiah B. Dyer, Thomas Quinlan, Frank Morrill, Patrick Morrison, Peter Hernon, E. D. Sherburne, H. P. Sylvester, Thomas Hockin and Alex. Cruickshank, by said violence, threats and intimidation, to prevent the said Jacob McClure from obtaining work or employment at his said trade and occupation in the shops and works of the said

Wetmore & Morse Granite Company of Montpelier aforesaid, or in any other shops or works for the cutting or manufacture of granite work."

Second count:

"That Josiah B. Dyer, Thomas Quinlan, of Barre, in the county of Washington, and Frank Morrill, Patrick Morrison, Peter Hernon, E. D. Sherhurne, H. P. Sylvester, Thomas Hocking and Alex. Cruickshank of Montpelier, in the county of Washington, on the 22d day of November, in the year of our Lord one thousand eight hundred and eighty nine, at Montpelier, in the county of Washington, being granite cutters by occupation, not being content to allow other granite cutters to pursue their avocations and employment, wherever they wished, and on whatever terms might be agreed upon between said other granite cutters and their employers, but contriving and unjustly and unlawfully intending to destroy the effect of free competition in the price and value of labor, to coerce and constrain said other granite cutters, and to compel said other granite cutters to join and become members of a branch of the National Stone Cutters' Union, an organization then and there organized and existing, at Montpelier aforesaid, and to prevent said other granite cutters from obtaining work at their said trade and occupation, did on the 22d day of November, A. D. 1889, at Montpelier aforesaid, with force and arms, combine, conspire, confederate and unlawfully agree together, and did enter into an organization and compact, whereby it was, among other things, provided that no person or persons not members of the said branch of the said stone cutters' union should be allowed to work in the shops of the Wetmore & Morse Granite Company of Montpelier aforesaid, or in any other shop or works for the cutting of granite, or manufacturing of granite work. And the said Josiah B. Dyer, Thomas Quinlan, Frank Morrill, Patrick Morrison, Peter Hernon, E. D. Sherburne, H. P. Sylvester, Thomas Hocking and Alex. Cruickshank in the pursuance of the said unlawful conspiracy, combination and compact, with the intent by violence, threats and intimidation to prevent one Jacob McClure then and there being a stone cutter by trade and orcupation, *from obtaining or continuing work* at his occupation of granite cutting, in the said shops or works of the said Wetmore & Morse Granite Company of Montpelier

aforesaid, or in any other shops or works for the cutting of granite, did then and there threaten and say to Jacob McClure, who was then and there a laborer and workman as a granite cutter, in the shops and works of the said Wetmore & Morse Granite Company of Montpelier aforesaid, that if he, the said Jacob McClure, did not join and become a member of a branch of the National Stone Cutters' Union, then and there organized and existing at said Montpelier, that they, the said Josiah B. Dyer, Thomas Quinlan, Frank Morrill, Patrick Morrison, Peter Hernon, E. D. Sherburne, H. P. Sylvester, Thomas Hocking and Alex. Cruickshank, and others unknown to the state's attorney, would organize a strike against the said Jacob McClure, in the shops and works of the said Wetmore & Morse Granite Company of Montpelier aforesaid, and would prevent him, the said Jacob McClure, from obtaining work at his said trade of stone cutting in said shops of the said Wetmore & Morse Granite Company of Montpelier aforesaid, or in any other shops or works where granite cutting or manufacturing was carried on. . And the said Jacob McClure refusing then and there to become a member of the said branch of the National Stone Cutters' Union, the said Josiah B. Dyer, Thomas Quinlan, Frank Morrill, Patrick Morrison, Peter Hernon, E. D. Sherburne, H. P. Sylvester, Thomas Hocking and Alex. Cruickshank, did then and there threaten and say, to the said Wetmore & Morse Granite Company of Montpelier aforesaid, that unless the said Jacob McClure was turned away from his employment as a granite cutter, in the said shops and works of the said Wetmore & Morse Granite Company of Montpelier aforesaid, they, the said Josiah B. Dyer, Thomas Quinlan, Frank Morrill, Patrick Morrison, Peter Hernon, E. D. Sherburne, H. P. Sylvester, Thomas Hocking and Alex. Cruickshank, would organize a strike against the said Jacob McClure and would prevent the said Wetmore & Morse Granite Company of Montpelier aforesaid from obtaining or employing any workmen or laborers in their said shops or works. And by means of said sayings and threats the said Josiah B. Dyer, Thomas Quinlan, Frank Morrill, Patrick Morrison, Peter Hernon, E. D. Sherburne, H. P. Sylvester, Thomas Hocking and Alex. Cruickshank, did then and there affright, drive away and prevent the said Jacob McClure from obtaining and con-

tinuing his employment and labor in the said shops or works of the said Wetmore & Morse Granite Company of Montpelier aforesaid. And so the said state's attorney, on his oath aforesaid, says, that the said Josiah B. Dyer, Thomas Quinlan, Frank Morrill, Patrick Morrison, Peter Hernon, E. D. Sherburne, H. P. Sylvester, Thomas Hocking and Alex. Cruickshank, did then and there, in manner aforesaid, by threats, intimidation and the unlawful and grievous conspiracy aforesaid, carried into execution as aforesaid, prevent the said Jacob McClure from obtaining and prosecuting his said employment and work of stone cutting in the said shops and works of the said Wetmore & Morse Granite Company of Montpelier aforesaid, or in any other shop or works for the manufacture or cutting of granite."

The other points decided sufficiently appear in the opinion.

*Dillingham, Huse & Howland, Z. S. Stanton, John H. Senter,* and *W. A. Lord* for the respondents.

The proceeding could not be by information since the crime might be punishable by imprisonment in the state prison for more than seven years. Wright & Carson's Law of Crim. Conspiracies and Agreements, pp. 18, 97, 222; 1 Bish., Crim. Pro., s. 1150; *State* v. *Danforth*, 3 Conn. 112; *State* v. *Wilson*, 2 Root 69.

The motion for a verdict in favor of the respondent, Dyer, ought to have been granted. The evidence did not show that he was connected, directly or indirectly, with the acts complained of until after the crime had been committed. *Commonwealth* v. *McGowan*, 2 Pars. Select Cases, 314; *Reg.* v. *Gompertz*, 92 Q. B. 824.

The counts were defective for the reason that they charged the crime in the alternative. *Rex* v. *Robe*, 2 Strange 984-992; *Dary* v. *Baker*, 4 Burrow 2471; Ex. Parte Pain, 5 Barn. & Cress. 251; *Commonwealth* v. *Grey*, 2 Grey 501.

*J. P. Lamson* for the state.

Where the crime is one at common law and the conclusion is both against the form of the statute and the peace of the state, the former will be rejected as surplusage. *Davis* v. *State*, 3 Har. and Johns. 154; *Page* v. *Harwood*, Allyen 41; *King* v. *Dickinson*, 1 Saund. 135a; 1 Bish., Crim. Proc., 349; *Knowles* v. *State*, 3 Day 103; *Southwick* v. *State*, 5 Conn. 325; *Rex* v. *Journeymen Tailors*, 8 Mod. 10; *State* v. *Miller*, 24 Conn. 519; *Rawson* v. *State*, 19 Conn. 292.

TYLER, J. I. It is contended that the information is insufficient. Neither count is under Section 4226, R. L. That section provides that, "A person who threatens violence or injury to another person with intent to prevent his employment in a mill, manufactory, shop, quarry," etc., shall be punished, etc. It evidently is not directed to cases where two or more persons act in concert, as in sections 4236 and 4237. Nor is either count under section 4227, which is directed against persons who, by threats, intimidation or force, drive men from their employment with intent to prevent the prosecution of work in such mill, etc. The second count avers that the respondents threatened the Wetmore & Morse Granite Co. that they would prevent its obtaining workmen if it did not discharge McClure, but does not aver that the threats were made with such an intent as is necessary to bring the case within section 4227.

Conspiracy is an offence at common law. Bishop says it is connected with every form of wrong-doing cognizable by the law; that it is the corrupt agreeing together of two or more persons to do by concerted action something unlawful, either as a means or an end. The unlawful act must either be such as would be indictable performed by one alone; or, not being such, be of a nature particularly adapted to injure the public, or some individual, by reason of the combination.

2 Crim. Proced., s. 166; 2 Crim. Law, s. 171. Powers, J., said in *State* v. *Stewart et als.*, 59 Vt. 273:

"The reports, English and American, are full of illustrations of the doctrine that a combination of two or more persons to effect an illegal purpose, either by legal or illegal means, whether such purpose be illegal at common law or by statute; or to effect a legal purpose by illegal means, whether such means be illegal at common law or by statute, is a common law conspiracy. Such combinations are equally illegal whether they promote objects or adopt means that are *per se* indictable; or promote objects or adopt means that are *per se* oppressive, immoral or wrongfully prejudicial to the rights of others";

And cites, among other authorities, 2 Russ. on Crimes, "that all *conspiracies whatever*, wrongfully to prejudice a third person, are highly criminal at common law." See notes to this case in 59 Am. R. 710; *The King* v. *Mawbury*, 6 T. R. 636.

The counts of this information are in substantial compliance with the common law precedents. 2 Crim. Proced. chap. 18. They are in all material respects like those in the indictment in *State* v. *Stewart et als.*, which were held sufficient as setting out a conspiracy at common law. Our statute, R. L., s. 689, adopts so much of the common law of England as is applicable to the local situation and circumstances, and is not repugnant to our constitution and laws.

The main question that arises upon this branch of the case is whether the prosecution could be by information or must be by indictment. The respondents' counsel argue that conspiracy can be charged only by indictment, as conviction thereof was followed at common law by *villainous judgment*.

The ancient punishment of conspiracy was that called villainous judgment, which was that the offenders should lose the freedom or franchise of the law, so that they should be disqualified as jurors or witnesses, and have their lands.

and goods seized by the crown.    3 Chit. Crim. Law, 1144.
But the author says there has been no instance of the inflic-
tion of this punishment since the time of Edward III., and
that it was punishable like any other misdemeanor, at the
discretion of the court.    *Rex* v. *Spragg et al.*, 3 Burr. 997.
In 2 Russ. on Crimes, 574, it is said that this kind of judg-
ment had become obsolete, not having been pronounced for
some ages.    In 2 Bish. Crim Law, s. 240, conspiracy is de-
clared to be a misdemeanor, even in those cases where its
object is the commission of a felony.

R. L., s. 1618, provides that state's attorneys may prose-
cute by information all crimes except capital and those pun-
ishable by imprisonment in the state prison more than seven
years.    *State* v. *Haley*, 52 Vt. 476.

The first count charges a conspiracy to prevent McClure's
obtaining employment; the second, the actual accomplish-
ment of the purpose; both charge a conspiracy to do acts
unlawful at common law by means unlawful under the
statute.    *State* v. *Stewart et als*.

In section 940, Bish. Crim. Law, it is said that the ordin-
ary and appropriate common law punishment for a misde-
meanor is fine and imprisonment, or either, in the discretion
of the court; that it is inflicted in all cases in which the law
has not provided some other specific penalty.

Section 4365, R. L., provides that where an offence is
declared by law to be punishable by imprisonment, and it is
not specified that such imprisonment shall be in the state
prison, it shall be construed to mean that it shall be in the
house of correction.    The words, "declared by law," do
not necessarily or reasonably mean statute law only, but in-
clude the common law whenever it defines an offence and
makes it punishable by imprisonment.    In this view, the
claim that prosecution can only be by indictment is not
maintained.

II.    It is a general rule that the facts and circumstances

which constitute the crime must be stated with such certainty and precision that the accused may judge whether they constitute an indictable offence or not, in order that he may demur or plead to the indictment accordingly; that he may determine the kind of offence they constitute and prepare his defence, and that the court may know what judgment to pronounce upon conviction.   As Lord Kenyon said in *Rex* v. *Holland*, 5 T. R. 607, that the party accused may be apprised of the charge against which he is to defend himself; that the court may know what judgment shall be pronounced according to law, and that posterity may know what law is to be derived from the record.

It is elementary that an indictment, information or complaint must not charge the accused disjunctively, so as to leave it uncertain what is relied on as the accusation against him.   Thus, an indictment which alleged that the defendant made a forcible entry into two closes of meadow *or* pasture, was held bad.   *Speart's case*, 2 Rol. Abr. 81 ; so an information which alleged that the defendant sold beer *or* ale without an excise license, *The King* v. *North*, 6 Dowl. & Ryl. 143 ; and where one was charged with committing a certain nuisance *or* causing it to be committed, *Rex* v. *Stoughton*, 2 Stra. 900.   In *Rex* v. *Stocker*, 1 Salk. 371, an indictment for forging *or* causing to be forged, etc., was held ill.   But Lord Mansfield said in *Rex* v. *Middlehurst*, 1 Burr. 400 :

" Upon *indictments*, it has been so determined, ' That an *alternative* charge is *not* good (as ' forged or caused to be forged'), though *one only* need be *proved*, if laid *conjunctively* (as ' forged *and* caused to be forged'). But Ido not see the reason of it; the substance is exactly the same; the defendant must come prepared against both; and it makes no difference to him in any respect."

A forcible illustration of a disjunctive charge is *Ex parte Pain*, 5 B. & C. 251, s. c. 11 Eng. C. L. 450.  The indictment was under a statute which prohibited three kinds

of casks from being found attached to certain vessels in the Irish or British channels in certain circumstances; first, those of the kind used for smuggling spirits; second, those intended to be so used; third, those fit or adapted for that purpose. The allegation was that said vessel had attached twenty casks,  *  *  * "of the sort and description *used or intended to be used* for the smuggling of spirits"; *held,* that it was not alleged that the casks answered any one of the three descriptions, but one or another of them, and that the allegation being in the alternative was defective.

*Rex* v. *Morley,* 1 Y. & J. 221, was under a statute which enacted that no foreign silks or velvets should be imported or brought into Great Britain, upon penalty, etc. The averment in the count upon which the trial was had was " that the defendant imported *or* caused to be imported," etc. This was held bad for uncertainty. Several similar cases where the indictments were held ill are referred to in the opinion; as *Wingfeld* v. *Jaffery,* 1 Lord Raym. 284, " for selling live cattle *or* causing them to be sold"; *Attorney General* v. *Farr,* 4 Price 122, where the defendant was charged " with having been assisting or otherwise concerned in unshipping smuggled goods"; *King* v. *Stocker,* 5 Mod. 137, where the charge was " for making and fabricating, *or* causing to be made and fabricated, a bill of lading." It was said by the court in that case that, " It is true, in a strict sense, that he who causeth a forgery to be done is a forger himself, but then it ought to be so laid in the indictment"; that one was the proper act of the party, the other not, and the circumstances might require a distinct consideration as to the fine. In *Davy* v. *Baker,* 4 Burr. 2471, the declaration was that the defendant received a gift *or* reward, and was held bad, it not stating of what the gift or reward consisted.

In all these cases there is uncertainty in respect to the act with which the respondents are charged. Generally the charge is in the alternative, as that the respondent did one

thing *or* another thing; or that he did a certain thing *or* procured it to be done.

In *Commonwealth* v. *Gray*, 2 Gray 501, the complaint was that the defendant, without license, etc., did sell spirituous *or* intoxicating liquor to one White; *held*, that as the complaint left it uncertain whether the defendant was charged with having sold spirituous liquor, or intoxicating liquor not spirituous, it was insufficient to sustain a judgment.

But where a person was charged with having in his possession ten counterfeit bank bills, *or* promissory notes, with intent, etc., the indictment was held sufficient upon the ground that "promissory note" was used merely as explanatory of "bank bill," and meant the same thing. *Brown* v. *Commonwealth*, 8 Mass. 59. In *State* v. *Gilbert*, 13 Vt. 647, an information was held sufficient which alleged that the defendant feloniously stole, took and carried away a mare of a bay *or* brown color, the court holding that it was unnecessary to describe the color and that the colors named were the same.

In this case, the material averments in the first count, that the respondents entered into a conspiracy together, that the conspiracy was against McClure, that the purpose was to be accomplished by threats, intimidation and violence, are single and definite. But it is contended that the averment that the conspiracy was to prevent McClure "from obtaining work or employment, *or* continuing in his said work and employment" is alternative and bad. As it is alleged that McClure was in the employment of that corporation when the conspiracy was formed, *obtaining* employment in its shops and *continuing* employment there are synonymous terms. The two words convey a conjunctive and not a disjunctive meaning. Any other signification than that the conspiracy was to prevent McClure from having employment in those shops would be forced and unnatural. With

the addition, "or in any other shops or works," etc., the charge is of a conspiracy to drive McClure out of his employment as a stonecutter. The conspiracy is the gist of the offence here charged. *Commonwealth* v. *Judd*, 2 Mass. 337; *Commonwealth* v. *Shedd*, 7 Cush. 514; *People* v. *Mather*, 4 Wend. 259.

The same reasoning applies to the second count, which contains the further averments of threats to McClure to drive him out of employment.unless he would join the respondents' branch of the Union; of threats to the corporation that unless it discharged him from its service they would prevent its obtaining any workmen, and that it did drive McClure out of the employment of the corporation. Both counts contain unnecessary words, but the material allegations are not uncertain. While the rule requires that every offence shall be laid with reasonable certainty—"certainty to a certain extent in general"—both counts apprised the respondents with sufficient certainty of the offence of which they were accused. Greater strictness than this "would tend to render the law nugatory and ineffectual, and destroy or evade the very end of it."

III. The respondents' counsel contend that the testimony of Eagan and McDonald was improperly admitted. It consisted of a conversation had between those witnesses and Dyer and Morrison, two of the respondents, on the Sunday next after the acts complained of. The evidence of the state had tended to show that the respondents had driven McClure from the employment of the Wetmore & Morse Granite Company, and that on Saturday of that week he engaged to do some granite carving for Eagan; that on Sunday Dyer, McDonald and Morrison were at Eagan's shop to inquire about the agreement between Eagan and McClure; that Eagan told Dyer and Morrison of the agreement he had made; that McClure had afterwards told him of the trouble he had had at the Wetmore & Morse shops; that he

had made inquiry and ascertained that there would be trouble if McClure undertook to cut stone for him, and that he had cancelled the agreement. Eagan then testified to a conversation that followed as to the reason why McClure had not joined the union, and why he had been forced into his then present position. This evidence could not have been excluded, as it tended to show that Dyer and Morrison were connected with the alleged offence. We also think that the conversation was so closely connected with the main occurrence that it was not a mere narrative of a past event. It was *concomitant* with the principal act, and so connected with it that it might be regarded as the result and consequence of the co-existing motives of all the respondents. 1 Greenl. Ev. s. 110.

The testimony of Hernon was only to the effect that at Eagan's request he made inquiry whether the retention of McClure by Eagan would make trouble, and that he reported to the latter the result, which was testified to by Eagan. It amounted merely to this, that Hernon was the means through which Eagan ascertained a certain fact. It was immaterial how Eagan ascertained the fact or whether he ascertained it at all, or whether he retained or dismissed McClure from his service. The point was that Dyer and Morrison were at Eagan's making inquiry about his employment of a non-union man, and in the same connection discussing the subject of McClure's dismissal from the Wetmore & Morse shops.

The state was entitled to the testimony of Deputy Sheriff Camp. It tended to show that while Morrison was under arrest he made certain admissions to the officer about his connection with the union, the office he held in it, and his action in respect to McClure. It is true that he claimed to have acted under the instruction of other respondents and that he was not in fault, but so far as his statements tended to inculpate himself they were admissible. So far as they tended to criminate others the jury were carefully instructed as follows:

"But the declarations of one of the respondents not made in the prosecution of the undertaking, but after its completion, are not evidence against the others. For instance, the testimony of the witness Camp as to what was said to him by Morrison, is to be considered only as affecting Morrison, and is not evidence against the others."

This was a correct instruction in respect to the use they were to make of this evidence.

IV. At the conclusion of the testimony the respondents' counsel made the following motion : "We make a formal motion asking for a direction from the court, directing an acquittal of each one of the respondents upon the ground that there is no evidence to justify their conviction under either of the counts in . the information," which motion was overruled. It is now claimed that it should have been sustained on two grounds : First, that the real name of the organization to which the respondents belonged was the Granite Cutters' National Union, whereas it was called in the second count in the information the National Stone Cutters' Union ; second, that there was no evidence tending to connect Dyer with a conspiracy against McClure, and that he should have been discharged.

The motion could not have been sustained on the first ground because it failed to call the attention of the court to the misnomer. The court was not bound to have knowledge of the name of the organization. It is well settled that a motion for a verdict should state the precise grounds on which it is based, or the court may well disregard it. *State* v. *Nulty,* 57 Vt. 543. The defect was not of substance and the variance was so immaterial that it might have been cured by amendment had the attention of the court been directed to it. It is first pointed out in this court, which is equivalent to filing the motion here.

The other question must be determined by the evidence. That introduced by the state tended to show the following facts : That there was an organization called the Granite Cut-

ters' National Union, with a branch in every place where any considerable number of granite cutters were at work; that there were branches at Barre and Montpelier. The organization had a constitution and by-laws, a president, secretary, and an executive committee which also had a secretary. The executive committee held meetings at regular times and kept a record of its doings. Each branch also had its officers, rules and regulations, and held meetings. All the respondents were members of the organization. McDonald was president, Dyer was secretary, one of the executive committee and its secretary, and his office in Barre, where a paper was published, was the headquarters of the organization. Morrison was an officer called a shop steward, whose duty was to keep a record of all non-union men on works where he was employed and present their names at the branch meeting. It was also his duty to notify every non-union man to report at such meeting and take the obligations. If he refused, action would be taken against him which would result in his becoming a member or being obliged to leave his employment. The person for whom the non-union man worked would also be notified and action be taken against him if he retained such a man in his service. Morrill, Morrison and Sherburne worked at the Wetmore & Morse Shops. They belonged to the Montpelier branch and attended its meetings, and Morrill sometimes presided. About Oct. 15, 1889, McClure, who was a granite cutter and non-union, went to work in the Wetmore & Morse shops, and continued to work there till Nov. 21st, boarding at the same place with Morrill and Sherburne. Morrison soon called on him and informed him that he should have to report him. McClure gave reasons for not joining. In about a week Morrison again called on him, told him he had laid his case before the meeting of the branch which had directed him to notify McClure that he must report at their hall at the next meeting, on Nov. 20th, and that if he failed to report he would make him trouble. McClure wrote a let-

ter for Morrison to read at the meeting in which he stated reasons for not joining, and offered to pay the same amount as if he were a member. On Nov. 21st Morrison notified McClure that his case had been considered at the meeting and that it had been unanimously voted "that he had got to join the Union that day at 12 o'clock," that Morrill, as president *pro tempore*, would administer the obligation or oath to him, and that if he failed to report, action would be taken against him and a strike organized against him. About eleven o'clock that day Morrison again called on him and gave him a final choice between taking the obligation or being driven from the works. On the same day Morrill and Sherburne told him in substance that he would have to join or quit work. There were other conversations between Morrison, Morrill, Sherburne and McClure to the effect that unless he joined they would take action against him; that they would strike and demand his discharge and they would not allow him to work.

McClure refused to join and on November 22 quitted his employment.

The state's evidence further tended to show that Morrison procured a meeting of the executive committee to be held at Barre on Saturday evening, Nov. 23rd; that it was held to investigate McClure's case; that Morrison made a statement of the trouble with the latter, of McClure's letter to the meeting, of the meeting held at noon of the 22nd at the shops, and that while it was in session word came that McClure "had packed up and gone"; that Dyer was present at this meeting and recorded its proceedings and he and McDonald were appointed to go to Montpelier the next day to investigate; that they went accordingly and had the interview with Eagan before referred to, also with the secretary of the Montpelier branch.

The evidence did not tend to show that Dyer made any threats to or had any communication with McClure, yet he was a prominent officer in an organization whose purpose was

to compel all stone cutters to become members or leave their employment. His presence as such officer at the meeting of Nov. 23rd, his acceptance of the appointment with McDonald to visit Montpelier the next day and "investigate," his visit on Sunday and interviews with Eagan, Rice and others, were acts following so closely upon the action taken against McClure on Friday that they were a part of the *res gestae* of the offence charged.

The motion in arrest on the ground of the insufficiency of the information has already been considered.

*Judgment that there was no error in the proceedings of the county court, and that the respondents take nothing by their exceptions.*