WILLIAMS MANUFACTURING COMPANY ET AL. *v.* INSURANCE COMPANY OF NORTH AMERICA.

Special Term at St. Johnsbury, April, 1916.

Present: MUNSON, C. J., WATSON, HASELTON, POWERS, and TAYLOR, JJ.

Opinion filed February 17, 1919.

*Fire Insurance—Incomplete Structure—"Attached"—Renewal Policy—Previous Policies Considered in Construing—Insurance Agent—When Agent of Insurer—When Agent of Insured—Waiver of Proof of Loss—Questions Considered on Review—Evidence—Interest of Mortgagee—Lost Instrument—Evidence as to Possession—Proof of Lost Instrument—Exceptions Not Briefed Are Waived—Harmless Error—Plaintiff Not Bound by Concession of Defendant—Opinion Evidence—Value of Mill—Knowledge of Agent Chargeable to Principal—Construction of Policy—Cross-examination—Discretion of Trial Court—Reception of Evidence Out of Time—Presumption—Evidence—Knowledge of Insured of Rates—Instructions to Jury—Singling Out Certain Evidence for Comment—Furnishing Exhibits to Jury—Discretion of Trial Court.*

An incomplete structure may be insured as a building.

A fire insurance policy described the building insured as one with boiler house attached, and occupied as a steam power lumbering mill. The boiler house was connected on one side with a veneer mill by a closed runway and on the other side with a sawmill by a steam pipe, a shaving spout, and a sawdust pipe. *Held*, that the word "attached" generally means "annexed," and that the boiler house was "attached" to the veneer mill in the more usual sense of the word than to the sawmill.

In construing a "renewal" fire insurance policy the previous policies and the circumstances surrounding and attending their issue must be considered.

An insurance agent, in placing fire insurance on property, is presumably the agent of the companies that he represents.

An insurance agent, in procuring fire insurance on plaintiff's property through another agent at plaintiff's direction, on the evidence, was the plaintiff's agent.

The plaintiff claimed that the veneer mill which was destroyed by fire, was covered by the insurance policy in question. *Held*, that the evidence warranted the finding that it was so covered.

A nonwaiver agreement executed by the parties to the policy did not preclude a waiver of proof of loss by defendant's statements to plaintiff, not fairly falling within the nonwaiver agreement, that it would pay the loss if the plaintiff could show that the property burned was the property insured.

On review, only those grounds specifically pointed out in a motion for a verdict need to be considered.

In an action on a fire insurance policy, it was not error to permit plaintiff's counsel in his preliminary statement to tell the jury that a bank was interested as mortgagee and to outline the situation, where the policy, when admitted, showed that it was for the benefit of the bank, and evidence afterwards admitted showed its interest as mortgagee, and, the policy being lost, it became necessary to trace it into the possession of the mortgagee.

Evidence of the interest of the bank as mortgagee and that the suit was brought for its benefit was admissible, since, under the policy, the rights of the mortgagee were different from those of the mortgagor.

The policy having been lost, it was proper for the plaintiff to show that the mortgagee had the policy before the fire, that after the fire it was sent to the plaintiff, and that plaintiff's president left it with

the insurance adjusters, and had not seen it since, though he had made diligent search.

The plaintiff asked defendant to produce the policy. The defendant replied that it could not, and offered plaintiff what it claimed was a full and true copy. *Held*, that the plaintiff was not obliged to accept what the defendant said was a copy, but could prove the policy in its own way.

There was no error in the admission of evidence of part of the policy which, connected with other evidence, tended to prove the entire policy.

Exceptions not briefed are waived.

The testimony of one of defendant's agents that the policy was a fire insurance policy insuring against loss by fire for one year, if erroneously received, was harmless, the policy itself being later admitted in evidence.

The plaintiff was properly permitted to prove the value of the mill burned notwithstanding the fact that the defendant conceded that it was worth as much as the amount of the policy in question.

Testimony of a witness, who described the size and construction of the mill destroyed, of its value was not objectionable on the ground that the value was shown piecemeal, where the witness did not testify as to the value of any of its parts, but, having testified to his knowledge of it, gave only his estimate of its value as an entity.

The policy contained the general provision that it should be void if the subject of insurance be a manufacturing establishment, and it be operated in whole or in part at night later than ten o'clock. It also contained a clause subsequently written by its local agent relating to the running of the "mill" after ten o'clock at night. *Held*, that knowledge of the local agent several months before the policy in question was issued, and while the defendant was an insurer of the mill, of the way the veneer mill was run and that it was necessary to run parts of the same all night was admissible as aiding in the construction to be given to the clause in the policy subsequently written by the agent.

Knowledge of an insurance agent as to the premises insured is chargeable to the insurer.

In view of the knowledge which defendant's agent and the plaintiff had of the property, and of the fact that there was insurance of about $10,000 on the mill insured, evidence that the sawmill was worth from $500 to $1,000 was admissible as tending to show that the sawmill was not the "mill" insured.

It is not error to allow a cross-examiner to inquire about the same matters testified to in direct examination.

It is within the discretion of the trial court to allow leading questions.

It is within the discretion of the trial court to receive evidence out of time.

After the policy in question was written, plaintiff's agent for looking after its insurance in Vermont wrote to Ranney, defendant's local agent who wrote the policy in question, asking for the rates on plaintiff's property. Ranney replied, giving the rate on the veneer mill as eight per cent. and the rate on the sawmill and boiler house as seven and one-half per cent., the rate at which the policy was written. There was evidence that these rates were fixed before the policy in question was written and that the plaintiff had knowledge of the same. *Held*, that the letters should have been received in evidence as tending to show that the sawmill was the "mill" insured.

In an action on a "renewal" policy of fire insurance, it is not necessary for the plaintiff in his opening case to show the situation as to the property insured when the first policy in the line of policies was issued.

Where the trial court did not undertake to rule as matter of law on the admission of evidence objected to as being out of time, it will be presumed that the evidence was received when it was as matter of discretion.

A party is not entitled, as matter of law, to have a certain piece of evidence singled out for special comment by the trial court in its charge to the jury.

The jury after retiring requested to be furnished with the policy in question, and it was furnished them by order of the court. *Held*, that it was in the court's discretion to refuse defendant's request that the jury also be furnished with the correspondence and exhibits leading up to the execution of the contract.

ASSUMPSIT on a fire insurance policy. Plea, the general issue with notice. Trial by jury at the December Term, 1913, Caledonia County, *Fish*, J., presiding. Verdict and judgment for the plaintiffs. The defendant excepted. The opinion states the case.

*Dunnett & Shields* for the defendant.

*Porter, Witters & Harvey* for the plaintiffs.

HASELTON, J.  This is an action of assumpsit on a fire insurance policy.  Trial by jury was had, and verdict and judgment were for the plaintiff.  The defendant excepted.

Before the early spring of 1906, the plaintiff had purchased certain land in East Haven in this State.  On this land there was at the time of the purchase a sawmill and a boiler house situated with reference to each other in a way and manner hereinafter to be indicated.

In March, 1906, the plaintiff had in process of construction, on the premises purchased, a veneer mill, the location of which in reference to the sawmill and the boiler house will be stated in a convenient part of this opinion.

On March 28, 1906, a policy of insurance having one year to run was issued by the defendant on property of the plaintiff at East Haven, described as a "frame, metal roof building, with frame, metal roof boiler house attached," and on the contents of such buildings in the way of machinery and tools.

The evidence was conflicting as to how far the construction of the veneer mill had progressed at this time.  The plaintiff's evidence tended to show that the veneer mill was then nearly completed and that a large amount of machinery was then therein.  The defendant's evidence tended to show that the veneer mill was not completed and ready for operation until a month or more after the date of the insurance policy.  However, an incomplete structure may be insured as a building, and the state of progress on the veneer mill at the time of the insurance is no great aid in the construction of the policy.  14 R. C. L. 953.

April 3, 1906, the description of the buildings insured was changed so that the roofs of the buildings were described as "paroid" and not as metal.  Upon the expiration of this policy, a second policy was issued by the defendant to the plaintiff.  The description of the property remained unchanged.  At the expiration of another year, and at the expiration of the second policy, that is March 28, 1908, a third policy, the policy in suit, was issued by the defendant to the plaintiff.  The description of the property was the same as before, and the policies were alike in all respects except dates and premiums.  The veneer mill was destroyed by fire January 31, 1909.

Numerous exceptions were taken during the trial, but following the course taken by counsel on both sides we first consider exceptions 31, 33, and 40, which present the grounds of a

motion by the defendant for a directed verdict in its favor. The ground of this motion that we first consider is in brief this: That there was no evidence to warrant the jury in finding that the property burned was covered by the insurance.

The plaintiff, at the time the policy in suit was issued, had on its land at East Haven a boiler house with a sawmill on the one side of it and the veneer mill on the other side. From the sawmill to the boiler house there extended a steam pipe, about five inches in diameter and boxed in, a shaving spout, about ten inches in diameter, and a sawdust spout. Between the sawmill and the boiler house there was a space of about twenty feet, which was used as a driveway, the pipe and spouts not interfering with its use as such. The boiler house was only four or five feet from the veneer mill, and from the one to the other was a runway covered in.

The policy described the insured buildings as a frame, paroid roof building, with a frame, paroid roof boiler house attached and additions thereto, owned and occupied by the assured as a steam power lumbering mill.

Here there is no patent ambiguity, and the plaintiff contends that no latent ambiguity arises from the testimony as to the plaintiff's property and the history of its insurance by the defendant and all the circumstances. But the plaintiff further and more especially, claims that the jury were justified in resolving any latent ambiguity as to the subject-matter of the policy, in favor of the plaintiff's claim that the veneer mill was the "lumbering mill" insured.

The defendant claims that the circumstances and correspondence in evidence show that the sawmill, which was not burned, and not the veneer mill which was destroyed by fire, was the mill that the insurance company was asked to insure and did insure, that there was no latent ambiguity for the jury to resolve, and that, on the ground that the mill burned was not the mill insured, the defendant's motion for a verdict in its favor should have been granted.

The description of the roof of the mill insured as "paroid" was, according to the testimony, a correct technical description of the roof of the building burned. The roof of the sawmill was called "flintox," and while the testimony showed similarity between a flintox roof and a paroid roof there was no evidence that the names were interchangeable, or that either name was used

to indicate both kinds of roofing.   The boiler house was "attached" to the veneer mill in a more usual sense of the word "attached" than was the sawmill.   The boiler house was "connected" with both the veneer mill and the sawmill, but while the words "connected" and "attached" sometimes have the same meaning, they are not coterminous in signification.   For instance, one speaks of a dwelling house as being connected with a sewer, but never as being attached to a sewer, of offices being connected by telephone, but not of one being attached to another by telephone.   When a building is spoken of as being attached to another, it is generally meant that it is annexed to that other.   And here the evidence tended to show in a natural sense that the boiler house was annexed to the veneer mill, but in a very strained sense only could it be said the boiler house was annexed to the sawmill.

The description of the mill insured as a "lumbering mill" was a very loose description of either mill.   In common speech a sawmill is a sawmill and a veneer mill is a veneer mill.   Of the two, the phrase "lumbering mill" suggests a sawmill rather than a veneer mill, though there was some evidence in this case that veneer mills are sometimes called lumbering mills.

This policy or contract of insurance, though complete in itself, was, however, what is commonly termed, and what is termed by the witnesses and exhibits in this case, a "renewal" of the policy issued March 28, 1907, and that was, in the same sense, a renewal of the policy issued March 28, 1906, and the previous policies and the circumstances surrounding and attending their issue must be taken into consideration in the construction of the one in suit.

The plaintiff for a long time had and now has a manufacturing plant in Northampton, and one C. H. Pierce was an insurance agent at Northampton, who for a long time had placed insurance on the plaintiff's property there.   In placing such insurance he was presumably the agent of the companies that he represented.   This Mr. Pierce was directed by the plaintiff's president and manager to procure insurance on the plaintiff's property at East Haven, in Vermont, and took steps toward procuring the insurance through one Ranney of St. Johnsbury, the agent of the defendant and other companies in this State; and so far as Pierce assumed to act in that regard, he appears on the evidence to have acted as an insurance broker, and as the agent

of the plaintiff. This is the view of the matter taken by the trial court, and while the plaintiff claims that Pierce was the agent of the defendant, we think the evidence relied on to show such agency cannot fairly be said to have had that tendency.

March 23, 1906, Pierce wrote the defendant's agent Ranney asking for the rate on the plaintiff's sawmill property at East Haven formerly owned by the Silsby estate. He wrote that he thought the plaintiff was improving the property, and that he should place the insurance. Three days later he telegraphed, and also wrote, requesting Ranney to "bind" $8,000 on the sawmill and boiler house and $3,000 on all machinery and tools, including engines and boilers therein. In the letter he said that he could give Ranney a plan of the property, though he made a statement that displayed a mixture of knowledge and ignorance with regard to it. He supposed, as he stated, that Ranney would have all the information in regard to it. He promised, as soon as possible, to give further information in regard to it. In reply to the telegram, Ranney wrote Pierce that he understood that what was wanted was $8,000 on the mill and boiler house and $3,000 on machinery therein, and that he had wired Pierce for a plan of the property, and trusted that the latter would be able to give it with a survey. Ranney's letter stated that he would place the insurance in seven companies one of which was the defendant company. The next day, which was March 27, 1906, Pierce replied, saying that he could not give a plan of the property. In that reply he referred to the sawmill and to a veneer mill "which will be erected." In closing he said he would try to have a plan made of the property, and would send such plan as soon as possible. In his first letter he said that the sawmill was "about 40x100," and in the last letter above referred to he gave the dimensions of the veneer mill as "say, 100 x 40."

The correspondence pointed to the sawmill and boiler house as the property to be insured, but left the description very much in the air, with the defendant's agent insisting upon a more definite description of the property to be insured. There is no evidence that he got such description from Pierce.

The plaintiff's evidence tended to show that the description of the property to be insured was procured from Frank Milholland, the plaintiff's resident manager at East Haven. Milholland testified that at the time the insurance was taken out in March,

1906, Ranney, the defendant's agent, telephoned the former that the latter had received instructions from Northampton to place insurance and that he wanted a description of the property and asked the witness to call on him at his office in St. Johnsbury, or asked if the witness was going to be down that way. The witness testified that he told Ranney that it was the new mill that was to be insured, that he said nothing whatever about insuring the sawmill, and that in Ranney's office at St. Johnsbury, in connection with a conversation with Ranney, he drew a diagram showing just how the property was situated, with reference to the boiler house and how the new mill was attached to the boiler house. So the correspondence alone does not determine the description of the property insured by the policy dated March 28, 1906, for the plaintiff's evidence tends to show that the description was sought and procured by the defendant's agent from the plaintiff's manager at East Haven and was given orally; and the letters and the oral testimony being what they were, the question of what the minds of the parties met upon, what the descriptive language in the policy of March 28, 1906, was mutually understood to mean, was a question for the jury. That the original policy was written with something in the mind of the defendant's agent other than an ordinary "sawmill" is indicated by the avoidance of that familiar and unmistakable word and the use of the broader and more elastic expression "lumbering" mill. Pierce had used no such expression in his letters, and its use in the policy tends to indicate that the description of the property insured as a lumbering mill with a boiler house attached and contents was used because of the information obtained from Milholland, and tends to show that the original policy was intended to cover the veneer mill as described to Ranney by Milholland. Ranney, it may be remarked, had died before the trial.

The New England Insurance Exchange, an association of agents recognized, in a manner, by their respective companies, made from time to time a rating of property the subject of insurance, and expected it to be conformed to by the various agents. One of the agents testified that they attempted to enforce it. This insurance was written by the defendant's agent Ranney at the rate on the sawmill as appears by computation, a rate which until some time after the second policy was written was eight and one-half per cent., no rating until that time having

been made on the veneer mill. Some time after the issuance of the second policy the exchange made a rating of seven and one-half per cent. on the sawmill and boiler house and of eight per cent. on the veneer mill. The defendant's agent, however, wrote the last policy at the seven and one-half per cent. rate, as a mathematical computation shows. This was a circumstance having a strong tendency to show that the insurance was on the sawmill and not on the veneer mill. But it could not, as matter of law, be controlling—it was a circumstance for the jury. The same must be said of the enumeration of the contents of the boiler house and mill insured. Following an omnibus clause covering every thing in the way of machinery, there is an enumeration of various machines and kinds of machinery, in the main applicable either to the sawmill and boiler house or to the veneer mill and boiler house. The defendant claims that the enumeration of specific articles of machinery describes the contents of the sawmill and boiler house more closely than it does the contents of the veneer mill and boiler house. But the defendant got no such enumeration from Pierce, as his letters show, and whether the list was got in some other way, or, as is probable was an enumeration of articles of machinery likely to be found in a lumbering mill, we do not know.

We do not here follow out all the details of the argument relating to the evidence relied on by the defendant as tending to show that the property burned was not the property insured, for since there was substantial evidence tending to sustain the claim of the plaintiff to the contrary, the claim of the defendant that a verdict should have been directed in its favor, on the ground that we have thus far considered, cannot be sustained.

A second ground of the defendant's motion for a directed verdict in its favor was that, even if the policy of insurance covered the mill burned, there was on the evidence no proof of loss as required by the policy, nor any waiver of such proof.

Proof of loss as required by the policy was not made. However, the plaintiff's evidence tended to show that the defendant denied its liability solely on the ground that the property burned was not the property insured, and proof of loss was thereby waived, unless the plaintiff's evidence in that regard was incompetent and unavailing in consequence of a certain nonwaiver agreement. The nonwaiver agreement was dated March 3, 1909, was signed by the defendant through one Monroe, its

special agent, and by the plaintiff by its president, and read as follows:

"WHEREAS it is claimed by the Williams Mfg. Co. of Northampton, Mass., (herein designated as Claimant) that a fire occurred on the 31st day of January, 1909, in East Haven, Vt., whereby Claimant sustained loss and damage to property described in policy claimed to have been issued by the insurance company signing this agreement; and WHEREAS the parties hereunto mutually desire to investigate the cause of the fire, the rights of the Claimant and the liability, if any, and the circumstances connected therewith and relating thereto, and in so doing the parties mutually desire to avoid incurring or creating any forfeiture, waiver, or estoppel; NOW THEREFORE, in consideration of the avoidance of delay, it is stipulated and agreed by and between the parties hereto, that no act or thing, done, performed, said, or omitted by the said insurance company since the happening of said alleged fire or in connection with such investigation, or examination, or in requiring or accepting proofs of loss, or in requiring the examination under oath of any person, or in requiring further or additional proofs, or in requiring plans, specifications, magistrate's or notary's certificates, inspection of saved property, books, bills, invoices, vouchers, inventories, or other information, or in exercising any option or right given by said policy, or in the appraisement of the sound value, and loss and damage, if any, or in any matter or manner whatever, shall be construed as a waiver of any breach of warranty or forfeiture incurred by the Claimant, or as a waiver of any of the stipulations, conditions, or warranties of said policy, or as working, creating, or affecting any estoppel against enforcing and claiming the benefit of all such forfeitures, breaches of warranties, nor shall the incurring of trouble or expense by or on behalf of the Claimant, in aid of such investigation, in making proofs of loss, or in complying with the requirements of said insurance company be held or construed to work, create, or effect any estoppel or waiver.

"It is, however, expressly agreed that the amount of the sound value and loss when ascertained and stated in writing. agreed to and signed by the parties hereto, or by appraisement by the Appraisers, or by an Appraiser and the Umpire as provided in said policy, shall be final and conclusive as to the amount of such sound value and loss only, and such ascertain-

ment or appraisement shall in no manner affect any question as to the liability of said insurance company to pay the loss, the purpose of this agreement being to expressly reserve the same.''

This agreement was prepared in behalf of the defendant. While it is vague and prolix, it seems clear enough that it was intended to provide for an investigation unembarrassed by thought of the consequences, in respect to any rights, of what might be done or said in furthering the investigation. It is said in the defendant's brief: ''The nonwaiver agreement had been formally entered into by the parties for the express purpose of enabling matters between the parties to be discussed without considering anything which might be said as a waiver, and the record fails to show that it had ever been abrogated.''

But whether abrogated or not, it did not extend to any communication not within its provisions, which the defendant might choose to make to the plaintiff. And the testimony on the part of the plaintiff tended to show a waiver of proof of loss, by statements, not entering into any discussion or investigation, to the effect that the company would pay, would be glad to pay, if the plaintiff could show that the property burned was the property insured. These statements and assurances did not fairly fall within the nonwaiver treaty, and the evidence with regard to them tended to show a waiver by the defendant of the proofs of loss required by the policy.

The grounds of the defendant's motion for a verdict that were specifically pointed out in the motion have been discussed, and no other grounds need to be considered. *Spencer* v. *Potter's Estate,* 85 Vt. 1, 10, 80 Atl. 821; *State* v. *Dyer,* 67 Vt. 690, 32 Atl. 814; *Bickford* v. *Travelers Ins. Co.,* 67 Vt. 418, 32 Atl. 230; *State* v. *Nully,* 57 Vt. 543.

Another question argued under the motion is, however, otherwise raised in the case, and will be considered in due course. The defendant's motion for the direction of a verdict in its favor was properly overruled.

The exceptions that remain to be considered are numerous. In a preliminary or opening statement to the jury, made partly before and partly after the jurymen were sworn, the plaintiff's counsel stated that the Citizens Savings Bank and Trust Company was interested as mortgagee, and outlined somewhat the situation. The defendant's exceptions 1, 2, 3, 4, and 5, were taken to statements in this regard. But the policy when ad-

mitted showed that it was for the benefit of this banking institution, as its interest might appear, and evidence afterwards admitted showed its interest as mortgagee, and the policy contained a clause providing that the insurance, to the extent of the interest of the mortgagee, should not be invalidated by act or neglect of the mortgagor nor by certain other doings. This clause was followed by certain provisions. The policy, too, was lost, and it became necessary, before proving it otherwise than by its production, to trace its history and to show it into the possession of the mortgagee. There was no error in permitting the preliminary statement in the respects touched upon in the exceptions mentioned.

Exceptions 6, 7, 8, and 9 relate to statements by counsel of what the evidence would tend to show in other respects, and, as the evidence did tend to show, in substance, the things stated, we consider the questions raised by these exceptions in treating of the exceptions to evidence, so far as the testimony in this regard was excepted to.

Exceptions 10, 13, and 15, were to rulings of the court, admitting evidence of the interest of the bank as mortgagee and of the fact that the suit was brought for the benefit of the mortgagee. But, as the rights of the mortgagee were, under the policy, different from those of the mortgagor, the evidence was properly received.

The insurance policy was lost, as we have already said, and the plaintiff introduced evidence to the effect that the bank had the policy before the fire; that after the fire the bank sent the policy to the plaintiff company; that the president of the company went before the insurance adjusters with the policy and left it with them, and had not seen it since, though he had made diligent search. To the reception of a part of this evidence the defendant took its exceptions 11 and 12. But the exceptions are of no avail. The plaintiff had a right to show the loss of the policy, and to that end to show through whose hands it had passed and where it was last left.

The plaintiff's attorney asked the defendant to produce the policy. The defendant's attorney said they did not have it and could not produce it, but that they could and would furnish a copy and offered the plaintiff what the defendant claimed was a full and true copy. But the plaintiff was not obliged to accept what the defendant said was a copy, and proceeded in its own way

to prove the policy. The plaintiff offered an exhibit as a copy of a part of the policy. This was received under objection and exception. It purported to show a part only of the policy, but a part having relation to the other parts that testimony afterwards introduced by the plaintiff tended to prove. There was no claim that the policy, as the plaintiff's evidence finally tended to show it, did not correspond with the copy in the hands of the defendant's attorneys. The exception is number 14, and was taken to evidence which, connected with other evidence, tended to prove the entire policy, and the defendant gets nothing from its claim of error in this matter. Exception 16 is not briefed and is therefore waived. Exception 25 was of the same character as 14.

The plaintiff called a witness, who testified that he was a special agent of the defendant to adjust losses, and that he and special agents of other companies, that had insurance on the same property of the plaintiff, met the plaintiff's president after the fire to discuss questions about the fire and the policies. He said the policy in question was a fire insurance policy insuring against loss by fire. Exception 17 is to his being permitted to say this. He also said that he understood the policy was for one year. Exception 18 goes on the ground that it was error to receive this last statement. The grounds of exceptions 17 and 18 were stated to be that the witness was construing the policy, and that the policy was the best evidence. But if there was any technical error in this matter, it became absolutely harmless in view of later developments in the case.

One Milholland, the plaintiff's foreman, described the size and construction of the veneer mill, which the plaintiff claimed was covered by the insurance, and estimated its value with its piping and fixtures as $10,000 at the time of the fire. The defendant's exception 19 is to the admission of this testimony, and, so far as any objection to it was pointed out, it was based upon the fact that the defendant conceded that the plaintiff had a veneer mill there, and that it was worth as much as the amount of the policy, meaning, we suppose, this one policy. Whatever we may think of the concession, it was no legal barrier to evidence.

Some parts of the description given by the witness tended, in connection with other evidence, to identify the veneer mill as property covered by the insurance policy in question. As to the valuation the defendant now says it was shown piecemeal,

contrary to the views expressed in *Ide* v. *Boston & Maine Railroad*, 83 Vt. 66, 101, 74 Atl. 401.   But it was not shown piecemeal, for the witness did not testify to the value of any of its parts or timbers; but having testified to his knowledge of it, he gave only his estimate of its value as an entity.

The policy contained the general provision that it should be void, if the subject of insurance be a manufacturing establishment, and it be operated in whole or in part at night later than ten o'clock.   The plaintiff's evidence tended to show that in the operation of the veneer mill in the daytime from thirty to thirty-five hands were employed, but that in order to run the mill at all it was necessary to run the dryer, the vats where the logs were steamed, the dynamo, and the electric light system through the night, and that three or four hands had to be employed at night for these purposes, and that at the time of the fire there was no operation of the mill in any other sense.   The plaintiff's evidence further tended to show that some time in September or October, 1907, the local agent of the insurance company, the agent who wrote the insurance in question, came to the plaintiff's property at East Haven and made a thorough examination of the veneer mill, went all over it, talked with the manager about it, saw the drying machine, asked how late at night it was run, was told that it was run nights, that the veneer mill couldn't be run if the dryers were shut down at night.   The witness also testified that the insurance agent was shown the vats in which logs were boiled, and was told that they were operated at night, how the steam was furnished them, and that the veneer mill could not be operated without the vats were run all night.

The defendant's exceptions 20, 21, 22, 23, 28, 29, and 30 relate to the reception of this testimony as to the way the mill was run and the knowledge that the insurance agent had of the veneer mill, and the way it was run and had to be run at a time five or six months before the policy in question was issued and while the agent's principal was an insurer of this mill, as there was evidence tending to show.

The agent's knowledge was the knowledge of the insurance company, and its knowledge of the mill and the way it was run and had to be run was an aid in the construction to be given to the clause in the policy, subsequently written by this agent, relating to the running of the "mill" after ten o'clock at night.

The policy contemplated that the mill should be operated, and the evidence was admissible.

The plaintiff, under objection and exception, introduced evidence to the effect that the sawmill was worth from $500 to $1,000.

The mill insured carried insurance placed by Ranney to the amount of about $10,000. In view of the knowledge which the defendant's agent and the plaintiff had of the property, this was a circumstance which, in connection with other evidence, tended to show that the sawmill was not the property insured. This holding disposes of exceptions 24, 27, and 32. Exception 26 is not briefed. Exceptions 31 and 33 relate to grounds of the defendant's motion renewed at the close of the evidence and already considered.

Mr. Williams, the president of the plaintiff company, was called by the defendant, and in cross-examination, under objection and exception, testified that after the fire he telephoned to Mr. Pierce telling him that the mill had burned.

It appears by the transcript that on direct examination he testified to this telephone message and the substance of it, and it was not error to let the cross-examiner inquire about the same matter. Exception 34 relates to this matter, and also to the form of a question on the ground that it was leading. But it is within the discretion of the trial court to allow leading questions. The defendant called as a witness Williams, the president of the plaintiff's company, and, in the course of his direct examination, asked him questions which drew out testimony that C. H. Pierce was an insurance agent at Northampton who was ordered to cover this "East Haven property" by insurance. In cross-examination the witness testified, without objection, that he never gave Pierce directions to place or procure insurance on the sawmill. This testimony, drawn out in part by the defendant and as to the rest given without objection by the defendant, necessarily amounted to testimony that the directions of the witness to Pierce had been to place insurance on the veneer mill and not on the sawmill. The cross-examiner proceeded, under objection and exception, to get the witness to say in terms that his only instructions to Pierce about placing insurance on the East Haven property, were to place insurance on the veneer mill property. Exceptions 35 and 36 relate to this testimony, which added nothing to what had, in effect, already been given by the same wit-

ness, and we are not therefore called on to consider the grounds of the exceptions.

In the examination of a witness called by it, the defendant had a certain paper marked for identification as exhibit 26. In cross-examination counsel for the plaintiff, under objection and exception, elicited from the witness testimony to the effect that he had compared the typewritten parts of the exhibit with the corresponding parts of the lost policy sued on, and that they were the same. This was a part of the process already referred to by which the plaintiff proved the contents of the lost policy. The testimony was out of time, since it was not rebuttal, but it was within the discretion of the court to receive it. Since, in the end, there was no dispute about the policy and its terms, no time need be taken with this exception which was number 37.

Exception 38 was taken to the exclusion of two letters, exhibits 33 and 34, offered by the defendant. The plaintiff, at some time before the letters were written, had selected one Bannister, a resident of Vermont, to look after its insurance here. One of the letters was dated July 27, 1908, and was from Bannister to Ranney, agent of the defendant and of numerous other companies, asking for the rates on the buildings of the plaintiff at East Haven. The other letter was the reply of Ranney to Bannister, dated July 28, 1908. It gave the rate on the veneer mill as eight per cent. and the rate on the sawmill and boiler house as seven and one-half per cent., the rate at which the policy in question was written. These letters were written after the date of the policy in question, but the defendant's evidence tended to show that the rates mentioned had been fixed before the policy in question was written, and that the plaintiff had knowledge of the rates, and had accepted a rebate in consequence, and the information obtained by Bannister from a source of his own seeking tended to show that the rates on the East Haven property, as charged prior to the issuance of the policy in question, had continued without further change down to and past the time when that policy was issued. The plaintiff here suggests that the letter of Ranney to Bannister was inadmissible as a self-serving declaration on the part of the defendant, but we do not think it was obnoxious to the rule regarding such declarations, and these letters in connection with the amount of the insurance and the premium must have convinced the jury that the policy was written at the rate which the in-

surance exchange had made upon the boiler and sawmill, and not upon the veneer mill. The letters were important and should have been received and their exclusion requires a reversal. But as we have, in substance, already said, in considering the defendant's motion for a verdict, the defendant had a legal right to depart from the rating on the veneer mill, and write a policy thereon at a lower rate, and the probability or improbability of its doing so was for the jury to consider.

In the statement of matters introductory to exception 39 some of the testimony as to rating is recited in the bill, but that exception is not briefed and is therefore waived.

One Silsby, who formerly owned the East Haven mill property consisting, as he said, of 8,000 acres of land and the sawmill, estimated the value of the sawmill at $10,000.

During the plaintiff's cross-examination, several objections were made and exceptions taken. The exceptions are grouped as exception 40.

One objection was on the ground of immateriality merely, and for the other objections no ground was stated. It is enough to say that the inquiries objected to were within the reasonable latitude allowable in cross-examination.

Exception 41 was to the admission of the testimony of one Donahue, called by the plaintiff in rebuttal, who testified that on March 28, 1906, the date of the first policy, the frame of the veneer mill was up and boarded and covered in; that the roofing was on the main part of the mill; that the machinery of the mill was practically all in; that a walk from the veneer mill to the boiler room was then built, and, as he thought, covered. This and other like testimony was taken under objection and exception on the ground that it was not rebuttal. But the court ruled, as matter of law, that it was, and in this ruling the court was right. The plaintiff in its opening had not gone back of the date of the policy in suit, March 28, 1908, and it was no necessary part of the plaintiff's opening case to do so.

If one who brings suit on an insurance policy complete in itself, must, if it is what is commonly called a renewal policy, go back in his opening case to the situation that existed when the first policy in the line of policies was issued, it might not infrequently be the case that one would be obliged in his opening to go back not one, two or three years but thirty or more, that is, to a time in the remote past when he first got his house or other

buildings insured. The evidence under consideration was in rebuttal of testimony introduced by the defendant, as the transcript, referred to as to this exception, shows.

Several other witnesses called by the plaintiff in rebuttal gave testimony much the same as that just referred to as given by Donahue. It also came in under objection and exception on the ground that. it was not properly rebutting testimony. The disposition of the exception relating to Donahue's testimony disposes also of the exceptions relating to the testimony of these witnesses. These are exceptions 42, 43, 51, 52, 53, and 54. Exception 44 is not briefed. It related to the putting in of a new boiler, which the witness on the stand testified was put in about September 1, 1907. Exception 45 was to a ruling, as a matter of law, permitting the witness to testify that the new boiler was in on the occasion when Crawford Ranney was there, as testified to by the witness and already referred to herein. The objection to the testimony was that it was not rebuttal; that the defendant had put in no evidence on the subject.

The witness had testified that the boiler referred to was put in about September 1, 1907, and in his testimony given early in the case had testified that Ranney was there, as he thought in the latter part of September or in October, 1907. Therefore so far as the testimony of this witness was concerned what was put in under the objection and exception now under consideration amounted to little if anything more than testimony that September 1st preceded the latter part of September and October. Furthermore, without objection and exception, the witness was allowed to proceed to testify that this boiler was shown to Ranney when he was there. The transcript is vouched on the question of whether the evidence, taken under objection and exception, was properly rebuttal, a matter about which counsel are sharply at issue; but we have said enough to show that the question is of no consequence, and that if the court was wrong its error was entirely harmless.

Exceptions 46 and 47 were taken to the admission of evidence in the order of rebuttal testimony which the defendant claimed was not of that character. But as to the character of this evidence the court did not undertake to rule as matter of law, and it is to be taken that the evidence was received when it was, as matter of discretion. Therefore no error appears. Most of the testimony of Milholland as to the description and plan of

the property to be insured, given by him to Ranney when the first policy was written, in 1906, came in under objection and exception, the exceptions taken being numbers 48, 49, and 50. Exceptions 48 and 50 are not briefed and therefore are waived. Exception 49 related to the part of this testimony as to the talk with Ranney and the diagram drawn for him.

The only ground of this exception argued here is that the testimony was not rebuttal. But such it clearly was in view of letters introduced by the defendant as exhibits.

We have thus far taken notice of the defendant's exceptions up to exception 55. Exceptions 55 to 67, inclusive, relate to the nonwaiver agreement, and the waiver of proof of loss notwithstanding, questions which we have already considered sufficiently. Exception 56 does not appear to be briefed. Exceptions 68 and 69 are not briefed. Exception 70 relates to the overruling of the defendant's motion for a verdict made at the close of the evidence. Exceptions 71 to 80, inclusive, were to remarks in argument by counsel for the plaintiff. Some of these remarks were withdrawn. Some related to the course of the trial as it had appeared. Some rather weak inferences the jury was asked to draw from the evidence, but an argument does not need to be strong to make it admissible. We are not satisfied that the defendant was prejudiced by anything said in argument. Of these exceptions, number 75 is not briefed.

Exceptions 81, 82, 83, and 84 were to the failure of the court to comply with certain requests of the defendant. Exception 81 is not briefed. Exception 82 was sufficiently complied with. Exception 83 related to the necessity of a meeting of minds of the agents of the respective corporations so that both intended the policy to insure the same property. The charge as to such necessity taken as a whole was sound and emphatic. The request laid undue emphasis on one letter of Pierce to Ranney, for that was but a piece of evidence which the defendant was not entitled, as matter of law, to have singled out for special comment. Exception 84 was to a request at variance with the request covered by exception 82, in that the former asked the jury to consider the change in rates and the rebate, circumstances which a strict compliance with the latter would have excluded. The exception 84 proceeded with a proposition as to the necessity of a meeting of minds, and the defendant was not entitled to a reiteration on that subject and so the request in any view was faulty.

Exceptions 85, 86, 87, 88, 90, 91, 92, and 93 were to the charge as given in certain particulars.   Exception 85 was to a statement as to the interest of the bank.   We have already, in effect, considered the propriety of such a statement.   It was not error to make it.   Exceptions 86 and 87, in effect, complain of the submission to the jury at all of the question of whether the "mill" was run after ten o'clock at night, and of the matter of proof of loss.   But both questions were for the jury.   These matters have been sufficiently discussed.   Exception 88 was to a part of the charge making the knowledge of the defendant's agent, at the time of the writing of the policies, the knowledge of the defendant itself.   The ground of the exception was that there was no evidence making such knowledge material.   But it is enough to say that the exception was not well grounded.   Exception 89 was based upon a misapprehension of what the court had said and no time need be taken with that.   Exception 90 recurs to the running of the "mill" after ten o'clock at night.   It assumes that the court had charged that the ten o'clock at night provision of the policy was abrogated by the mere visit of the defendant's agent to the plaintiff's plant.   But this is far from being what the court had charged, and the exception does not avail.   Exceptions 91 and 92 again assert the claim that the policy was void because of want of proof of loss.   This question need not be again considered.   Exception 93 does not appear to be briefed.   Anyway it was unsound.   It asserted that the plaintiff must show by more than a fair balance of proof that the policy covered the veneer mill.

The jury after retiring requested to be furnished with the policy, and it was furnished them by order of court.   Counsel for the defendant then insisted that the jury should also be furnished with the correspondence and exhibits leading up to the execution of the contract.   This the court declined to do in its discretion at that time, and the defendant took an exception which is number 94.   The court acted within its discretion, and the defendant has nothing here to complain of.

Our disposal of some of the assignments of error has been somewhat summary, but in view of their number their treatment is salutary.   Reference is made to the remarks of Judge VEAZEY in *Melendy* v. *Bradford,* 56 Vt. 148, when he reflected upon the possibilities growing out of shorthand reporting, and to the remarks of the court in *Hooker* v. *Hooker,* 88 Vt. 335, 352, 92 Atl.

443. The Supreme Court of the United States has expressed itself well and emphatically in this regard in *Phillips* v. *Seymour*, 91 U. S. 646, 648, 23 L. ed. 341, and in *Central Vermont Ry. Co.* v. *White*, 238 U. S. 507, 59 L. ed. 1433, 35 Sup. Ct. 865, Ann Cas. 1916 B, 252, at the outset of the opinion. A perusal of the current English Reports is also commended.

*Judgment reversed and cause remanded.*